UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X
BENJAMIN PATRICK

              Plaintiff,

    -against-

CAROLYN W. COLVIN
Acting Commissioner, Social Security
Administration,

              Defendant.
---------------------------------------------------------X

**FILED**
**CLERK**

3/30/2015 3:41 pm

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**<u>ORDER</u>**
13-CV-2174 (SJF)

FEUERSTEIN, J.

        Benjamin Patrick ("plaintiff" or "claimant" or "Patrick") commenced this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of the final determination of defendant Commissioner of Social Security Administration ("Commissioner") denying plaintiff's application for disability benefits. Now before the Court are the parties' cross-motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons that follow, the Commissioner's motion is denied and plaintiff's motion is granted in part and this case is remanded for further findings consistent with this opinion.

## I.     BACKGROUND

###     A.    Administrative Proceedings

        On February 28, 2011, plaintiff filed an application for social security disability benefits claiming he was unable to work because of a disabling condition. [Docket Entry No. 20 (Transcript of Administrative Record ("Tr.")), at 105]. On July 7, 2011, the Social Security Administration ("SSA") denied plaintiff's application on the ground that he was not disabled under the Administration's rules. *Id.* at 59-62. A physical residual functional capacity assessment by a single decision maker diagnosed plaintiff with bilateral shoulder injuries and

lumbar degenerative changes (*id.* at 47) but found that the plaintiff could perform significant gainful employment. *Id.* at 49. Pursuant to plaintiff's request for a hearing by an Administrative Law Judge ("ALJ") (*id.* at 63), a hearing was held on March 22, 2012 before ALJ Brian J. Crawley, at which plaintiff appeared with his attorney and testified. *Id.* at 29-45. On April 5, 2012, the ALJ issued a decision (the "ALJ Decision") finding that plaintiff was not disabled within the meaning of the Social Security Act and therefore not entitled to disability insurance benefits. *Id.* at 17-28. Plaintiff filed for review by the Appeals Council, submitting legal argument and additional medical evidence with his appeal. *Id.* at 12-15.

On February 22, 2013, the Appeals Council denied plaintiff's request for review of the ALJ's April 5, 2012 decision, rendering the ALJ Decision the final decision of the Commissioner. *Id.* at 1-10.

On April 10, 2013, plaintiff commenced this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of the Commissioner's final determination. [Docket Entry No. 1]. On August 1, 2013, the Commissioner filed an answer and served plaintiff with the administrative record. [Docket Entry Nos. 6-7]. On April 24, 2014, the Commissioner moved for judgment on the pleadings [Docket Entry No. 15], and the plaintiff cross-moved for judgment on the pleadings. [Docket Entry No. 17].

B.    Medical Evidence

1.    Medical Evidence Prior to First Disability Hearing and Unfavorable Decision

On April 13, 2010, plaintiff, a corrections officer, presented at the New York Hospital Queens emergency room following an incident where plaintiff restrained a violent inmate. Tr. at 178-83. Plaintiff reported that his right arm had become pinned under the inmate. *Id.* at 179.

Plaintiff had a history of a left Achilles tendon rupture and repair and a right rotator cuff repair. *Id*. Upon examination, plaintiff's right upper extremity showed no ecchymosis, a notable proximal medial bulge, good flexion but weak supination and tenderness along the biceps in the area of absent distal tendon. *Id*. X-rays of the right humerus showed no fracture or lytic or sclerotic lesion, but a small ossific opacity adjacent to the greater tuberosity which was possibly a small interarticular loose body or calcific tendinosus at the right shoulder, and enthesopathy at the olecranon at the insertion of the triceps. *Id*. at 178. The examiner assessed a right distal bicep tendon rupture. *Id*. at 179. Plaintiff's arm was put in a sling and he was advised to not work. *Id*. at 179, 183. Plaintiff was prescribed Naproxen, told to rest, ice and follow up with physical therapy and a sports medicine doctor; plaintiff discussed the possibility of future surgery with the consulting doctor. *Id*. at 179-183.

On April 20, 2010, plaintiff saw Dr. Ray A. Haag, an orthopedic surgeon, for an examination of his right upper extremity. *Id*. at 209. A physical examination of the head and neck revealed no gross abnormalities and no cranial nerve dysfunction, a full range of motion in plaintiff's neck, with no masses or organs felt and no deformity of the neck present. *Id*. A physical examination of plaintiff's upper extremities showed a ninety (90) degree scapula humeral abduction on the right and eighty (80) degrees on the left, overall abduction in both shoulders at ninety (90) degrees, external rotation at thirty (30) degrees on the right and twenty (20) degrees on the left, internal rotation to the buttock, bilateral. *Id*. at 209-210. Dr. Haag noted he "found nothing in the upper extremities showing a real injury, but feels sore and limited motion of the elbows above [plaintiff's] head." *Id*. at 210. Upon physical examination of the back, it was noted that plaintiff could not flex his back at all. *Id*. Physical examination of the

lower extremities revealed that plaintiff's knees were "okay" and there was "[n]o evidence of any tendon rupture or any major injury that could be seen." *Id*. Dr. Haag diagnosed a lumbosacral sprain and contusion and sprain of the left upper extremity. *Id*. Dr. Haag prescribed x-rays of the lumbar spine, an MRI of plaintiff's right arm, physical therapy for plaintiff's upper extremities and back, and Aleve for pain. *Id*. As a result of this examination, Dr. Haag found that plaintiff was temporarily and totally disabled (*id*), and provided a note stating that plaintiff had a contusion of both arms and lumbar sprain, and that plaintiff was totally disabled. *Id*. at 184, 210.

On April 21, 2010, lumbar spine x-rays showed mild degenerative changes manifested by small anterior spurring, and preserved vertebral body heights and disc spaces, normal alignment, and no pars defects. *Id*. at 230.

On May 3, 2010, plaintiff began attending physical therapy at Ultra Health Physical Therapy and Aquatic Therapy ("Ultra Health"). *Id*. at 190. Plaintiff presented with increased bilateral upper extremity/shoulder and lower back pain, decreased bilateral shoulder and lumbar spine range of motion/strength, and postural/gait abnormalities. *Id*. Plaintiff indicated that this pain was aggravated by lifting/carrying objects, pushing/pulling objects, ascending/descending steps, performing transitory movements, and picking up objects from the floor (*id*.) and was eased by rest, inactivity and medication. *Id*. at 191. Plaintiff attended a total of fourteen (14) physical therapy sessions and was discharged on June 7, 2010. *Id*. at 189. Plaintiff's physical therapy discharge notice indicated limited improvements with his lumbar spine and bilateral shoulder including decreased pain levels, increased range of motion/strength, improved walking quality/ability with increased physical tolerance and functional ability. *Id*. Plaintiff subjectively

complained of continuing limited ability to perform activities of daily living due to developing progressive pain/symptoms. *Id.* Plaintiff indicated that his walking quality/ability had improved and he was currently able to ambulate for approximately twenty (20) minutes before requiring a rest period. *Id.* Plaintiff was discharged from physicals therapy at his request in anticipation of additional diagnostic testing and a second opinion from another physician. *Id.*

On May 4, 2010, plaintiff returned to Dr. Haag for a follow up visit, complaining of right shoulder pain. *Id.* at 221. X-rays of plaintiff's lumbar spine showed degenerative changes but no fractures. *Id.* Dr. Haag noted that "[i]t appears to be only a lumbosacral sprain of his back." *Id.* Examination of plaintiff's right shoulder showed that "it appear[ed] to be that he [had] pulled the long head of the biceps, so he injured the long head of the biceps of the right arm." *Id.* Plaintiff had "pretty good motion of the shoulder, 90/90 degrees of scapula humeral abduction, overall 120 degrees both shoulders, 30 degrees of external rotation of the shoulders...[f]ull motion of the back, negative straight leg raising, hips [were] okay." *Id.* On plaintiff's right arm, Dr. Haag noted what appeared to be a defect where the long head of the biceps had been pulled off and his bicep muscle was chunked up showing that it was not getting the pull from the long head of the bicep tendon. *Id.* Der. Haag ordered an MRI to assess whether surgery was needed. *Id.*

An MRI of plaintiff's right arm taken on May 24, 2010 showed no fracture or dislocation, no significant bone marrow edema, normal visualized portions of the tendon and normal triceps tendon with no abscess collection, but showed that at the myotendinous junction of the biceps muscle and tendon there appeared to be a mild T1 hyperintensity within the muscles suggesting an intramuscular tear and small hemorrhage. *Id.* at 186.

Nevertheless, on May 25, 2010, plaintiff returned to Dr. Haag who noted that plaintiff was getting better with improved motion of his right arm. *Id*. at 220. Dr. Haag noted that plaintiff still had trouble with his left shoulder, he was unable to fully scapula humeral abduct his left shoulder and overall abduction was only one hundred and thirty (130) degrees on the left whereas it was one hundred and eighty (180) degrees on the right, plaintiff only had twenty (20) degrees of external rotation of the left shoulder whereas he has forty-five (45) degrees on the right. *Id*. Plaintiff indicated that more pain and soreness of the left shoulder than any other place. *Id*. Dr. Haag noted that plaintiff's major problem was now his left shoulder and gave him Codman exercises for his left shoulder and ordered an MRI of the left shoulder. *Id*. Dr. Haag believed that plaintiff had a rotator cuff tear and probably a labral tear of his left shoulder. *Id*. at 187, 220. Dr. Haag noted that plaintiff was partially disabled but was doing desk work at the time. *Id*.

On June 7, 2010, plaintiff returned to Dr. Haag with complaints of pain in his left shoulder. *Id*. at 219. Dr. Haag noted that plaintiff had been engaged in physical therapy but that he thought "they have been doing to [sic] much" and plaintiff was "actually getting worse again." *Id*. Dr. Haag noted that plaintiff has pain and limited motion of his left shoulder, that he could only bring it up to eighty (80) degrees and could not fully abduct or rotate it. *Id*. Dr. Haag instructed plaintiff to do Codman exercises hourly but did not think plaintiff should take any pain medication. *Id*. Dr. Haag diagnosed stress inflammatory condition of the left shoulder with tendinopathy. *Id*. at 188, 219. Dr. Haag did not think plaintiff should have surgery. *Id*. Dr. Haag noted that plaintiff was partially disabled and was working. *Id*. at 219. Dr. Haag felt plaintiff was "uncooperative" and suggested he see another doctor for further care. *Id*.

On June 10, 2010, plaintiff visited Dr. Richard J. Tabershaw, M.D. at Suffolk Orthopaedic Associates, P.C. for an orthopaedic consultation of his right elbow and biceps, left shoulder and lumbosacral spine. *Id*. at 207. Dr. Tabershaw reported that plaintiff was status post involvement in a scuffle at work as a New York City Corrections Officer and that while trying to subdue an inmate, plaintiff developed right biceps pain, left shoulder pain and lower back pain. Plaintiff had been doing physical therapy, taking over-the-counter anti-inflammatories and had been working light duty desk work only. *Id*. Examination of plaintiff's right shoulder revealed an obvious deformity consistent with a ruptured biceps tendon, full range of motion in plaintiff's elbow, weakness with resisted elbow flexion and supination at the shoulder, tenderness at the subacromial space, mildly at the AC joint and over the glenohumeral joint, limited motion actively to ninety (90) degrees, passively one hundred (100) degrees, rotator cuff weakness measuring 4+ /5 with complaints of discomfort, and discomfort with cross chest adduction. *Id*. Plaintiff was unable to perform an apprehension sign because of capsular adhesions. *Id*. at 207-08. There was no tenderness, good range of motion, intact neurovascular exam and lower extremity strength, and no tenderness at the lumbosacral spine. *Id*. at 208. X-rays of plaintiff's right shoulder revealed minimal degenerative changes and no fractures or dislocations. *Id*. X-rays of plaintiff's lumbosacral spine showed normal bony anatomy and no fractures or dislocations. *Id*. Dr. Tabershaw reviewed an MRI brought by plaintiff of his right upper arm showing changes at the musculotendinous junction of the biceps into the bicep tendon consistent with tearing. *Id*. Dr. Tabershaw assessed a right biceps tear, distal biceps tendon tear, left shoulder rotator cuff tendinitis, impingement with adhesive capsulitis, lumbosacral spine sprain and strain that was improving. *Id*. Dr. Tabershaw ordered an MRI of plaintiff's left shoulder to

rule out a rotator cuff tear and suggested that plaintiff continue with physical therapy for all three areas. *Id.* Dr. Tabershaw ordered that plaintiff could continue with desk work only and could not work with inmates until further notice. *Id.* Dr. Taberhsaw assessed a temporary impairment of sixty-six point sixty-seven percent (66.67%). *Id.* Dr. Tabershaw prescribed Naprelan 750 mg daily, Xodol 5/300 one (1) to two (2) tablets every four (4) to six (6) hours for additional pain. *Id.*

On June 28, 2010, plaintiff commenced physical therapy at Island Shore Physical Therapy, LLP ("Island Shore") for an injury to his left shoulder. *Id.* at 200. Plaintiff had six (6) physical therapy sessions at Island Shore which concluded on July 10, 2010. *Id.*

On July 1, 2010, plaintiff returned to Dr. Tabershaw for a follow-up of his right biceps and left shoulder. *Id.* at 218. Plaintiff reported that he had started more aggressive therapy on his left shoulder but that it was still very stiff and painful and that his right biceps/elbow was still bothering him. *Id.* Plaintiff was on light duty work status, sedentary only, and could not be in any situation where he had to do anything other than paperwork. *Id.* Physical examination of plaintiff revealed positive biceps defect at the elbow right arm and over the anterior capsule, that plaintiff lacked a ten (10) degree of terminal extension, his left shoulder was active forward elevation to one hundred and ten (110) degrees, passive to one hundred and thirty (130) degrees, and he had limited internal/external rotation. *Id.* Dr. Tabershaw diagnosed posttraumatic left adhesive capsulitis severe, right biceps rupture and recommended that plaintiff continue with physical therapy for range of motion in the left shoulder and take Vicodin and anti-inflammatories. *Id.* Dr. Tabershaw ordered an MRI of the left shoulder, noting that plaintiff might require an MUA or an arthroscopic lysis of adhesions. *Id.* Dr. Tabershaw assessed

plaintiff's disability status as unchanged and that plaintiff had a 2/3 disability. *Id*. Dr.

Tabershaw advised plaintiff to consider seeking permanent light duty status as he did not think

plaintiff was ever going to achieve full return of his extremities. *Id*.

At a July 29, 2010 follow-up visit to Dr. Tabershaw, plaintiff stated that his right arm was

weak but not causing him any difficulty and that aside from the deformity, it was functioning

well. *Id*. at 217. Plaintiff stated that his left shoulder was causing significant pain, making it

difficult for him to sleep and that he felt it was not getting significantly better even with physical

therapy. *Id*. Physical examination of plaintiff revealed active and passive forward elevation to

about ninety (90) degrees, minimal external rotation, internal rotation to the belt line only, and

good muscle strength in the rotator cuff. *Id*. Dr. Tabershaw diagnosed persistent adhesive

capsulitis in plaintiff's left shoulder and status post right distal biceps rupture at the right elbow.

*Id*. Dr. Tabershaw recommended continued physical therapy for range of motion of the left

shoulder and an MRI of the left shoulder to rule out rotator cuff or labral injury. *Id.* Dr.

Tabershaw assessed plaintiff as sixty-six point six percent (66.6%) disabled and limited him to

desk duty at work. *Id*.

On September 14, 2010, plaintiff returned to Dr. Tabershaw for a follow-up of his right

elbow and left shoulder. *Id*. at 216. Plaintiff continued to complain of weakness at the right

elbow secondary to a distal biceps tendon rupture and stiffness, weakness and pain in the left

shoulder, despite continued physical therapy and light duty desk work. *Id*. at 216. Physical

examination of plaintiff revealed continued defect at the distal bicep tendon, good elbow flexion

and extension with 5-/5 strength, 4/5 strength with supination, left shoulder active elevation to

ninety (90) degrees, passive to one hundred and ten (110) degrees, internal rotation to the belt

line, external rotation to neutral and rotator cuff strength measuring 5-/5. *Id*. Dr. Tabershaw diagnosed right distal biceps tendon rupture, left shoulder adhesive capsulitis, rule out internal derangement such as rotator cuff and labral tear. *Id*. Dr. Tabershaw recommended that plaintiff continue with physical therapy and a home exercise program, continue using Naprelan and Xodol as needed for symptomatic relief, and sought authorization for an MRI of the left shoulder as soon as possible to evaluate for rotator cuff and labral pathology. *Id*. Dr. Tabershaw assessed plaintiff at sixty-six point six percent (66.6%) disabled and limited him to desk duty only at work with no contact with inmates. *Id*.

On October 18, 2010, plaintiff returned to Dr. Tabershaw, six (6) months status post right biceps distal rupture and left shoulder sprain. *Id*. at 215. Plaintiff's right arm had a permanent deformity with proximal migration of biceps. *Id*. Plaintiff's left shoulder was stiff and despite aggressive therapy had not shown significant improvement in range. *Id*. Plaintiff was performing light duty activities. *Id*. Physical examination of plaintiff revealed right elbow and right shoulder full range of motion, left elbow forward elevation to one hundred ten (110) degrees, active to one hundred and twenty (120) degrees, passive internal rotation to sacrum, external rotation to negative twenty (-20) degrees. *Id*. Dr. Tabershaw diagnosed status post right distal biceps rupture repair stable, left shoulder failure of rehab, still possible rotator cuff tear. *Id*. Dr. Tabershaw requested authorization for an MRI as soon as possible with arthroscopic surgery and prolonged physical therapy to follow. *Id*. Dr. Tabershaw assessed plaintiff at fifty percent (50%) disabled. *Id*.

On November 9, 2010, plaintiff returned to Dr. Tabershaw for a follow-up of the right biceps distal rupture and the left shoulder. *Id*. at 214. Plaintiff was still doing light duty work.

*Id.* Dr. Tabershaw noted that an MRI of plaintiff's shoulder was essentially normal; it did not show a rotator cuff tear or bicipital changes, though plaintiff felt his left shoulder was aching more and more and becoming stiffer. *Id.* Plaintiff had not had physical therapy since the end of September. *Id.* Physical examination showed right elbow deformity at the distal biceps rupture but full range and minimal discomfort, left shoulder forward elevation to one hundred and ten (110) degrees active and passive, and internal rotation to the sacrum, external rotation to negative twenty (-20) degrees. *Id.* Dr. Tabershaw noted there was no change since his last examination of plaintiff, and he could not rule out adhesive capsulitis which was plaintiff's clinical diagnosis. *Id.* Dr. Tabershaw requested authorization for arthroscopic examination with aggressive postop physical therapy protocol and advised plaintiff of the possibility of failure and the possibility of stiffness recurring or incidental tearing of other supplemental tissue; however, considering plaintiff's age and discomfort, this was the only option. *Id.* Dr. Tabershaw assessed plaintiff at fifty percent (50%) disabled. *Id.*

On November 15, 2010, the Medical Board for the New York City Employees' Retirement Systems ("NYCERS") issued a report following plaintiff's interview and examination on the same date. *Id.* at 201-05. The examination of plaintiff revealed passive range of motion of the right shoulder to one hundred and seventy (170) degrees, active to one hundred and ten (110) degrees, forward passive elevation in the left shoulder to one hundred and thirty (130) degrees and active elevation to eighty (80) degrees, abduction to one hundred and forty (140) degrees on the right and ninety (90) degrees on the left, external rotation to forty-five (45) degrees on the right and ten (10) degrees on the left, internal rotation to L2 with the right to the hip on the left, internal and external rotation strength 5/5, and obvious deformity of the

biceps on the right. *Id*. at 205. The report found that "the documentary and clinical evidence substantiate that Benjamin Patrick is disabled from performing the duties of a Correction Officer with the Department of Corrections" due to the April 13, 2010 line of duty accident, and recommended that Benjamin Patrick's application for Disability Retirement under the provisions of Section 507-c be approved. *Id*. at 201-05.

On December 3, 2010, plaintiff returned to Dr. Tabershaw for a follow-up of the right biceps and the left shoulder. *Id*. at 213. Plaintiff's right biceps was essentially unchanged, and the MRI of his shoulder showed no rotator cuff tear though plaintiff stated he felt his left shoulder was aching and getting stiffer, and noted he had not had physical therapy since September. *Id*. Physical examination revealed a right elbow deformity, no change in the distal biceps, left shoulder forward elevation to one hundred and ten (110) degrees active and one hundred and twenty (120) degrees passive, internal rotation to the sacrum, external rotation to negative twenty (-20) and noted that plaintiff's stiffness was significant. *Id*. Dr. Tabershaw sought authorization for arthroscopic examination as soon as possible and assessed plaintiff at fifty percent (50%) disabled. *Id*. Dr. Tabershaw noted that plaintiff was going out on early retirement on disability. *Id*.

On January 3, 2011, plaintiff returned to Dr. Tabershaw for a follow-up of the right biceps and the left shoulder. *Id*. at 212. Plaintiff stated that the right biceps was tolerable and things had not changed since the rupture. *Id*. Plaintiff stated that his left shoulder felt stiff; he was not anxious to do more physical therapy and had not been to physical therapy since September. *Id*. Plaintiff stated that he was "so miserable." *Id.* Plaintiff had retired in November. *Id*. Physical examination of plaintiff revealed right elbow deformity and no change

in the biceps, left shoulder forward elevation to one hundred and ten (110) degrees active and one hundred and twenty (120) degrees passive, internal rotation to the sacrum, external rotation to twenty (20) to ninety (90) degrees. *Id*. Dr. Tabershaw recommended six (6) to twelve (12) weeks of physical therapy and if that proved unsuccessful, arthroscopic surgery which would require physical therapy afterwards and only had a fifty (50%) success rate. *Id*. Dr. Tabershaw told plaintiff to continue taking an anti-inflammatory and prescribed Vicodin. *Id*. Dr. Tabershaw assessed plaintiff at fifty percent (50%) disabled. *Id.*

On February 11, 2011, plaintiff returned to Dr. Tabershaw for a follow-up. *Id*. at 211. Plaintiff stated that the right biceps was stable and was not to be treated. *Id*. Dr. Tabershaw noted that while plaintiff's left shoulder was "very stiff" on the last visit, he has "cajoled him into therapy" which he had done for the past six (6) weeks and stated that he felt "much better" and has "better motion" and "does not have significant pain." *Id*. Physical examination of plaintiff revealed the right elbow deformity and biceps was unchanged, left shoulder forward active and passive elevation was to one hundred and fifty (150) degrees, internal rotation was to L5, and external active and passive rotation to thirty (30) degrees. *Id*. Dr. Tabershaw concluded that plaintiff was "significantly better" and recommended that he continue aggressive physical therapy two (2) to three (3) times per week for six (6) weeks and take Vicodin as needed. *Id*. Dr. Tabershaw noted that if plaintiff still had significant limitation in six (6) weeks, he recommended proceeding with arthroscopic surgery but that if plaintiff "improve[d] as he did in the last interval, he will do fine and surgery will not be indicated." *Id*. Dr. Tabershaw assessed plaintiff at fifty percent (50%) disabled. *Id.*

On June 21, 2011, an x-ray of plaintiff's right shoulder revealed calcific tendinitis/bursitis. *Id*. at 236. An x-ray of plaintiff's lumbosacral spine showed disc space narrowing at L4-L5 and moderate straightening. *Id*. at 237.

2. SSA's Medical Consultants

On May 13, 2011, Dr. Erlinda Austria performed a consultative examination of plaintiff on referral by the SSA. *Id*. at 231-34. Plaintiff reported to Dr. Austria that he injured his right arm and left shoulder at work on April 13, 2010, that he had adhesive capsulitis, and was treated conservatively without surgery with physical therapy and pain medications, that he continued to experience constant pain to his right upper arm and left shoulder with limited range of motion, that on a good day his pain level was seven (7) out of ten (10), that he could lift twenty (20) to thirty (30) pounds, zip a zipper, button a shirt and open a jar, that sitting was not a problem, that he could stand for thirty (30) minutes and walk for thirty (30) minutes, climb one (1) flight of stairs at a time, and that he was currently undergoing physical therapy for his left shoulder. *Id*. Plaintiff's past history of arthroscopic right shoulder surgery for a rotator cuff tear in 1996, a repair of a ruptured left Achilles tendon in 2006, diagnosis of high blood pressure in 2009 and diabetes in 2003 was noted. *Id*. Plaintiff's current medications were listed as Naprosyn 500 mg p.r.n., Hydrocodone/acetaminophen 10/660 mg p.r.n., Hydrocodone/acetaminophen 7.5/750 mg p.r.n., Glucophage 500 mg q.g., Actos 50 mg q.d., and Enalapril 10 mg q.d. *Id*. at 231-32. Plaintiff stated that he lived with his daughters who did the cooking, cleaning, laundry and shopping, but that he could shower and dress by himself. *Id*. at 232. Physical examination of plaintiff revealed a normal gait and stance, no acute distress, ability to walk on heels and toes without difficulty, a full squat, no use of assistive devices, ability to change for exam and get on

and off the exam table without assistance and ability to rise from a chair without difficulty. *Id.* Plaintiff's hand and finger dexterity was intact, his grip strength was 5/5 bilaterally. *Id.* Physical examination of plaintiff's cervical spine showed full flexion and extension, lateral flexion bilaterally, rotary movements bilaterally, no cervical or paracervical pain or spasm and no trigger points. *Id.* Examination of plaintiff's upper extremities showed shoulder forward elevation to one hundred and forty (140) degrees on the right and one hundred and thirty (130) degrees on the left, abduction to one hundred and forty (140) degrees on the right and one hundred and thirty (130) degrees on the left, abduction thirty (30) degrees bilaterally, internal rotation to forty (40) degrees on the right and thirty (30) degrees on the left, and external rotation ninety (90) degrees on the right and seventy (70) degrees on the left, elbow flexion/extension one hundred and fifty (150) degrees on the right and one hundred and thirty (130) degrees on the left, pronation eighty (80) degrees bilaterally, supination to eighty (80) degrees bilaterally, full range of motion of forearms, wrists and fingers bilaterally, no joint inflammation, effusion or instability, strength 5/5 in proximal and distal muscles, no muscle atrophy, no sensory abnormality, and reflexes physiologic and equal. *Id.* at 232-33. Examination of plaintiff's thoracic and lumbar spines showed full flexion and extension, lateral flexion bilaterally, rotary movements bilaterally, no spinal or paraspinal tenderness, no SI joint or sciatic notch tenderness, no spasm, no scoliosis or kyphosos, SLR test negative bilaterally, and no trigger points. *Id*. at 233. Examination of plaintiff's lower extremities showed full range of motion of hips, knees and ankles bilaterally, 5/5 strength in proximal and distal muscles bilaterally, no muscle atrophy, no sensory abnormality, reflexes physiologic and equal, no joint effusion, inflammation or instability. *Id.* Dr. Austria noted that the x-rays were cancelled. *Id.*

Dr. Austria diagnosed an injury to right arm and left shoulder at work as a corrections officer in April 2010, an MRI showing ruptured right biceps and left shoulder adhesive capsulitis, arthroscopic right shoulder surgery in 1996 for rotator cuff tear and repair of left Achilles tendon rupture in 2006. *Id*. Dr. Austria noted that plaintiff's prognosis was stable with car service [sic] therapy for shoulder and right upper extremity injuries and continued conservative therapy. *Id*. Dr. Austria's medical source statement stated that in her opinion, plaintiff had "no restrictions to activities of the head or neck...minimal to mild restrictions to activities involving the left shoulder and no restriction to the rest of the upper extremities, including fine motor movement...no restriction to squatting, bending, prolonged sitting, standing or walking." *Id*. at 233-34.

On July 7, 2011, Dr. Marasigan, a state agency physician, reviewed the evidence on record, which did not include Dr. Tabershaw's records because Dr. Tabershaw did not respond to requests from the state agency. *Id*. at 238-40. Dr. Marasigan found that plaintiff had the residual functional capacity to lift/carry up to twenty (20) pounds, stand/walk and sit for up to six (6) hours per day, with no frequent overhead lifting or frequent reaching. *Id*. at 240.

### 3. Medical Evidence Submitted After the ALJ Decision

On June 20, 2012, after the ALJ's April 5, 2012 decision, plaintiff saw Dr. Mitchell Goldstein of Orlin & Cohen Orthopedic Associates LLP for pain in his spine/back, neck, right shoulder, left shoulder and right arms resulting from his April 13, 2010 altercation with an inmate. *Id.* at 255. Plaintiff complained of sharp and tight pain at a seven (7) on a one (1) to ten (10) scale when active, and at a six (6) when passive. *Id*. Plaintiff described the severity of the pain as ten (10). Plaintiff stated that he had not been treated for these conditions. *Id*. Plaintiff

stated that the pain was constant, but worse in the morning, in the afternoon, at night and with activity, and was worse while stretching and turning his head. *Id.* Plaintiff stated that the pain affected his ability to sleep and caused sleep disturbance, stiffness, headaches, aches and pins and needles. *Id.* Plaintiff said he was treating his pain with nothing. *Id.* Physical examination of plaintiff's neck revealed forward flexion to ten (10) degrees, extension to thirty (30) degrees, left lateral flexion to twenty (20) degrees, right lateral flexion to twenty (20) degrees, left lateral rotation to twenty-five (25) degrees, right lateral rotation to forty-five (45) degrees, pain with range of motion, pain and muscle spasm, 5/5 motor strength in all distributions of upper extremities, and sensation altered in the right upper extremity. *Id.* at 256. X-rays of plaintiff's cervical spine showed straightening consistent with spasm and minimal degenerative disc disease and spurs. *Id.* Dr. Goldstein concluded that plaintiff had a sprain/strain and a temporary partial impairments. *Id.* Dr. Goldstein assessed cervicalgia, degenerative spinal arthritis, myositis, and cervical radiculopathy. *Id.* Dr. Goldstein recommended a home exercise program, to apply ice to affected areas, and requested an authorization for physical therapy and a cervical spine MRI. *Id.*

On July 5, 2012, Dr. Goldstein completed a general physical impairment questionnaire. *Id.* at 258-62. Dr. Goldstein stated that he first saw plaintiff on May 28, 2012 and treated him monthly. *Id.* at 258. Dr. Goldstein listed his diagnosis of plaintiff as cervical radiculopathy, spinal arthritis and cervicalgia. *Id.* Prognosis was listed as "guarded." *Id.* The clinical findings in support of the diagnosis were listed as limited range of motion and tenderness, plaintiff's primary symptoms were listed as pain, limited range of motion, numbness and weakness, and plaintiff's pain was described as severe neck pain, constant pain, numbness and weakness. *Id.* at

258-59. Dr. Goldstein noted that plaintiff's symptoms and pain interfered with his attention and/or concentration "frequently" and that side-effects of plaintiff's medications that could impede his ability to work included "dizzy [sic], drowsiness, lose [sic] of concentration." *Id*. at 259. Dr. Goldstein advised that during the course of an eight (8) hour workday, plaintiff could occasionally and frequently lift less than ten (10) pounds, could occasionally and frequently carry less than ten (10) pounds (*id*.), that plaintiff experienced manipulative limitations, specifically limited abilities for fingering, handling, lifting, pushing, pulling, and fine manipulations in his right arm only. *Id*. at 259-60. Dr. Goldstein noted that plaintiff was incapable of pushing, pulling and bending on a sustained basis throughout an eight (8) hour workday. *Id*. at 261. Dr. Goldstein stated that plaintiff's impairments and associated limitations had been present since April 13, 2010. *Id*. at 262.

C.     Non-Medical Evidence

Plaintiff was born in 1958 in Bayshore, New York. *Id*. at 105. He graduated high school in June 1977. *Id.* at 134. An adult disability report (Form SSA-3368) (*id*. at 132-39) identifies plaintiff's alleged impairments as sprain of lumbosacral spine, right shoulder rotator cuff, strains of lumbosacral spine, right bicep tear, and left shoulder rotator cuff tendonitis impingement. *Id*. at 133.

Plaintiff's work history repot (Form SSA-3369) indicates that plaintiff worked as a corrections officer from August 1990 until November 2010. *Id*. at 151. From April 2010, the date of his injury, until November 2010, plaintiff worked on light duty which entailed sitting at a desk and handing out passes. *Id*. at 33.

A function report dated March 29, 2011 (*id*. at 121-31) indicates that plaintiff lived with his family. *Id.* at 121. Plaintiff reported that he has pain in his upper body which wakes him up while he is sleeping, and that because of his injury, he can no longer play basketball, football or baseball. *Id*. at 122. Plaintiff stated that he felt pain in his left and right shoulders (*id*. at 130), that the pain radiates up his neck and sometimes down his leg (*id*.), that his everyday living activities bring on the pain (*id*.), that the pain lasts until he sits and relaxes (*id*), that he takes Vicodin which relieved the pain after a few minutes and the pain relief lasted for a while. *Id*. Plaintiff reported that as a result of his injury he was not able to pick up heavy things (*id*. at 126), not able to stand, walk or sit for too long (*id*. at 126-27), he could climb average stairs (*id*. at 127), reach sometimes (*id*.) but could not kneel or squat. *Id*. Plaintiff reported he had "average" use of his hands and could see, hear and talk "all the time." *Id*. Plaintiff reported he had no problem with personal care (*id*. at 122), did not need any special help or reminders to take care of his personal needs or grooming or to take his medicine (*id*. at 123), he could prepare simple meals for himself on a daily basis (*id*.), he could clean, do his laundry and iron (*id*. at 124), that he goes outside often and can go outside alone (*id*.), that he drives (*id*. at 125), shops in stores for clothing, food and personal needs (*id*.), goes to the store for food every other day (*id.* at 126), is able to pay bills, count change and handle a savings account and that his injury did not affect his ability to handle money. *Id*. at 125. Plaintiff reported that his hobbies included watching television and reading (*id*.) but that since his injury he was a little slower and more careful in these activities. *Id*. at 126. Plaintiff reported that he spent his time with others talking, watching television and going out to eat (*id*.) and reported no changes in his social activities since his injury. *Id*. Plaintiff completed another function report on June 18, 2011 (*id*. at 140-50) in which

plaintiff reported that he could lift "not more than 50 lbs." (*id*. at 145) and in which he reported

that he felt pain in his "back, shoulders and arm" (*id*. at 149), that the pain was brought on by

"moving to [sic] much" (*id.*), that he got the pain "driving, sitting to [sic] long" (*id.*), and that

that he was taking hydrocodon and naprelan for the pain. *Id*.

At plaintiff's hearing before ALJ Crawley on March 22, 2012 (*id*. at 29-45), plaintiff

testified that after his injury, he did light duty work, which involved sitting at the desk and

handing out passes (*id*. at 33) but that he could not work because of pain in both of his shoulders

and numbness running down his arm. *Id*. at 34. Plaintiff testified that he could lift ten (10)

pounds, could sit for about half an hour, stand for about five (5) or ten (10) minutes and walk for

about five (5) or ten (10) minutes. *Id*. at 38.

Plaintiff testified that he could button buttons, zip a zipper, use a knife and fork, use his

right hand for personal needs like shaving and putting on a tie (*id*. at 34-35) and needed no help

getting dressed, taking a bath or showering. *Id*. at 42. Plaintiff testified that during the day he

watched television and cleaned the house, and shopped for food about once a month. *Id*. at 37.

Plaintiff said he was able to drive and do laundry on his own. *Id*. at 39. Plaintiff testified that he

had no problems using his hands (*id*. at 42), could use a computer (*id.*), could use his right hand

to go over his head to put food away in shelves, and had a limited ability to bend down to put

food in low cabinets. *Id*. at 41.

Plaintiff testified that he had been going to physical therapy and was currently taking

Naprosyn, Vicodin and wearing a pain patch (*id*. at 35) as well as trying to work out and stretch

to relieve his pain symptoms. *Id*. at 40-41. Plaintiff described the pain in his arm as "sharp,

sharp pain" and "like it's tight" (*id*. at 43) and described the pain in his shoulders and lower back

as constant. *Id*. at 44. Plaintiff said the pain in his lower back was exacerbated by moving around a lot (*id*.), he has trouble sleeping at night, and takes naps during the day. *Id*.

D.     ALJ Decision

After applying the five (5)-step sequential analysis set forth in C.F.R. § 404.1520, the ALJ found that plaintiff was "not disabled" within the meaning of the Social Security Act. *Id.* at 20. Specifically, the ALJ determined: (1) the plaintiff meets the insured status requirements of the Social Security Act through December 31, 2015 (*id*. at 22); that plaintiff has not engaged in substantial gainful activity since November 22, 2010, the alleged onset date (*id*.); (3) that plaintiff "has the following severe impairments: left shoulder rotator cuff tear, right bicep tear" (*id*.); (4) that plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (*id*. at 23); (5) that plaintiff has the residual function capacity to perform the full range of light work as defined in 20 C.F.R. 404.1567(b) (*id*.); (6) that plaintiff is unable to perform any past relevant work as a corrections officer (*id*. at 24); (7) that plaintiff was born on October 15, 1958 and was fifty-two (52) years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (*id*.); (8) that plaintiff has at least a high school education and is able to communicate in English (*id*.); (9) transferability of job skills is not material to the determination of disability because applying the Medical-Vocational Rules directly supports a finding of "not disabled," whether or not the plaintiff has transferable job skills (*id*.); (10) considering the plaintiff's age, education, work experience and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the plaintiff can perform (*id*. at 25); and (11) the plaintiff "has not been under a disability, as

defined in the Social Security Act, from November 22, 2010, through the date of this decision."

*Id.*

II.      DISCUSSION

     A.      Standards of Review

          1.      Rule 12(c)

Rule 12(c) of the Federal Rules of Civil Procedure provides that "[a]fter the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c).  The standard applied to a Rule 12(c) motion is the same as that applied to a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  *See Bank of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 922 (2d Cir. 2010).  To survive such a motion, "a complaint must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (internal quotation marks omitted).  The court must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party.  *Id.* at 679.  The court is limited "to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken."  *Allen v. WestPoint–Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991).

          2.      Review of Determinations by the Commissioner of Social Security

Upon review of the final decision of the Commissioner, a court may enter "judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  A district court must consider whether "there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied."  *Brault v. Social Sec. Admin., Com'r*, 683 F.3d 443,

447 (2d Cir. 2012) (quoting *Moran v. Astrue,* 569 F.3d 108, 112 (2d Cir. 2009)).  "[S]ubstantial

evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion."  *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir.

2013) (internal quotation marks and citation omitted).  "In determining whether the

[Commissioner's] findings were supported by substantial evidence, the reviewing court is

required to examine the entire record, including contradictory evidence and evidence from which

conflicting inferences can be drawn."  *Id.* (internal quotation marks and citation omitted).

Although the Commissioner's findings of fact are binding as long as they are supported

by substantial evidence, this deferential standard of review is inapplicable to the Commissioner's

conclusions of law or application of legal standards.  *See Byam v. Barnhart*, 336 F.3d 172, 179

(2d Cir. 2003); *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984).  Rather, courts have a

statutory and constitutional duty to ensure that the Commissioner has applied the correct legal

standards, regardless of whether the Commissioner's decision is supported by substantial

evidence.  *See Pollard v. Halter*, 377 F.3d 183, 188-89 (2d Cir. 2004).  If a court finds that the

Commissioner has failed to apply the correct legal standards, the court must determine if the

"error of law *might* have affected the disposition of the case."  *Id.* at 189 (emphasis added).  If

so, the Commissioner's decision must be reversed.  *Id.*; *Kohler v. Astrue*, 546 F.3d 260, 265 (2d

Cir. 2008).  If the application of the correct legal standard could lead only to the same

conclusion, the error is considered harmless and remand is unnecessary.  *See Zabala v.

Astrue*, 595 F.3d 402, 409 (2d Cir. 2010).

B.    Evaluation of Disability

1.    Standard for Determining Disability

Pursuant to 42 U.S.C. § 423(d)(1)(A), the term "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability benefits are only available where an individual has a physical or mental impairment "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). For the purposes of this section:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

Pursuant to regulations promulgated under the Social Security Act, the Commissioner is required to apply a five (5) step sequential analysis to determine whether an individual is disabled under Title II of the Social Security Act. 20 C.F.R. § 404.1520; *see also Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). The first step of the sequential analysis requires the Commissioner to determine whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i) and (b). "Substantial work activity" "involves doing significant physical or mental activities." 20 C.F.R. § 416.972(a). "Gainful work activity" "is the kind of

work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 416.972(b). If a claimant is doing "substantial gainful activity," the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(i) and (b). If the claimant is not engaged in any "substantial gainful activity," the Commissioner proceeds to the second step.

The second step requires the Commissioner to consider the medical severity of the claimant's impairment to determine whether he or she has a "severe medically determinable physical or mental impairment that meets the duration requirement in C.F.R. § 404.1509, or a combination of impairments that is severe and meets the duration requirement." 20 C.F.R. § 404.1520(a)(4)(ii). An impairment, or combination of impairments, is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). To meet the duration requirement, the claimant's impairment must either be "expected to result in death, [or] it must have lasted or must be expected to last for a continuous period of at least 12 months." 20 C.F.R. § 404.1509. The Commissioner will proceed to the next step only if the claimant's impairment is medically severe and meets the duration requirement.

At the third step, the Commissioner considers whether the claimant has a medically severe impairment that "meets or equals one of [the] listings in appendix 1 to subpart P of [20 C.F.R. Part 404 of the Social Security Act] and meets the duration requirement." 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant's impairment meets or equals any of the listings and meets the duration requirement, the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(d). If the claimant is not found to be disabled at the third step, the Commissioner must "assess and make a finding about [the claimant's] residual functional capacity [("RFC")] based

on all the relevant medical and other evidence." 20 C.F.R. § 404.1520(e). The RFC considers whether "[the claimant's] impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what [the claimant] can do in a work setting." 20 C.F.R. § 404.1545(a). The RFC is "the most [the claimant] can still do despite [his or her] limitations." *Id.*

At the fourth step, the Commissioner compares the RFC assessment "with the physical and mental demands of [the claimant's] past relevant work." 20 C.F.R. §§ 404.1520(a)(4)(iv) and (f). If the claimant can still do his or her past relevant work, the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant cannot do his or her past relevant work, the Commissioner proceeds to the fifth and final step of the sequential analysis.

At the fifth step, the Commissioner considers the RFC assessment "and [the claimant's] age, education and work experience to see if [the claimant] can make an adjustment to other work." 20 C.F.R. § 404.1520(a)(4)(v). If the claimant can make an adjustment to other work, the claimant is not disabled. *Id.* If the claimant cannot make an adjustment to other work, the claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(v). The claimant bears the burden of proving first four (4) steps of the sequential analysis, while the Commissioner bears the burden at the last step. *See Talavera*, 697 F.3d at 151.

C.      Application of the Five-Step Sequential Analysis

Plaintiff contends that the ALJ erred by: (1) erroneously discounting plaintiff's subjective complaints of pain and failing to acknowledge plaintiff's long work record in his credibility analysis and (2) applying medical vocational rule § 202.14 at step five (5). [Docket Entry No. 18].

1.       ALJ's Assessment of Plaintiff's Credibility

When a claimant's impairments fail to meet or equal any of the Listings, the Commissioner must assess the claimant's RFC before proceeding to the fourth and fifth steps of the sequential analysis. *See* 20 C.F.R. §§ 404.1520(e); 404.1545(a)(5). The Commissioner's RFC assessment must be based on "all of the relevant medical and other evidence" in the case record, including "any statements about what [the claimant] can still do that have been provided by medical sources" and any "descriptions and observations of [the claimant's] limitations from [his or her] impairments, including limitations resulting from [his or her symptoms], such as pain, provided by [the claimant] or [other persons]." 20 C.F.R. § 404.1545(a)(3). In addition, the Commissioner must consider the claimant's "ability to meet the physical, mental, sensory, and other requirements of work." 20 C.F.R. § 404.1545(a)(4). Both a "limited ability to perform certain physical demands or work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching)" (20 C.F.R. § 404.1545(b)), and a "limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, coworkers, and work pressures in a work setting" (20 C.F.R. §404.1545(c)), may reduce a claimant's ability to do past or other work. 20 C.F.R. § 404.1545(e) provides that:

> [w]hen [a claimant] ha[s] severe impairment(s), but [his or her] symptoms, signs, and laboratory findings do not meet or equal those of a listed impairment in [the Listings], [the Commissioner] will consider the limiting effects of all [the claimant's] impairment(s), even those that are not severe, in determining [his or her] residual functional capacity. Pain or other symptoms may cause a limitation of function beyond that which can be determined on the basis of the anatomical, physiological or psychological abnormalities

considered alone…In assessing the total limiting effects of [a claimant's] impairment(s) and any related symptoms, [the Commissioner] will consider all of the medical and nonmedical evidence…

20 C.F.R. § 404.1545(e).

In "determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account…but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citations omitted). The ALJ retains discretion to assess the credibility of a claimant's testimony regarding disabling pain and "to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant." *Marcus v. Califano,* 615 F.2d 23, 27 (2d Cir. 1979); *Snell v. Apfel,* 177 F.3d 128, 135 (2d Cir. 1999) (holding that an ALJ is in a better position to decide credibility). "Because it is the function of the agency, not reviewing courts, to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant, we will defer to its determinations as long as they are supported by substantial evidence." *Reynolds v. Colvin*, 570 F. App'x 45, 49 (2d Cir. 2014) (summary order) (internal citations omitted). The Second Circuit has "repeatedly held that a claimant's testimony concerning his pain and suffering is not only probative on the issue of disability, but 'may serve as the basis for establishing disability, even when such pain is unaccompanied by positive clinical findings or other 'objective' medical evidence.'" *Hankerson v. Harris*, 636 F.2d 893, 895 (2d Cir. 1980) (quoting *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979)). Thus, where there is a "medically determinable impairment[] that could reasonably be expected to produce [the claimant's] symptoms, such as pain," the ALJ "must then evaluate

the intensity and persistence" of the symptoms to determine how the symptoms limit a claimant's capacity for work. 20 C.F.R. § 404.1529(c)(1). "Further, because a claimant's symptoms, such as pain, 'sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone,' once a claimant has been found to have a pain-producing impairment, the Commissioner may not reject the claimant's statements about his pain solely because objective medical evidence does not substantiate those statements." *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 349-50 (E.D.N.Y. 2010) (citing § 404.1529(c)(2)-(3)).

In assessing a claimant's allegations concerning the severity of his symptoms, an ALJ must engage in a two-step analysis. First, "the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged." *Genier*, 606 F.3d at 49 (citing 20 C.F.R. § 404.1529(b)). Second, [i]f the claimant does suffer from such an impairment...the ALJ must consider the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record." *Id.* If plaintiff's testimony concerning the intensity, persistence or functional limitations associated with his impairments is not fully supported by clinical evidence, the ALJ must consider additional factors in order to assess that testimony, including: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the pain; (5) any treatment, other than medication, that the claimant has received; (6) any other measures that the claimant employs to relieve the pain; and (7) other factors concerning the claimant's functional limitations and restrictions as a result of the pain. 20 C.F.R. § 404.1529(c)(3)(i)-(vii). *Meadors v. Astrue,* 370 Fed. Appx. 179,

183 n.1 (2d Cir. 2010) (citing 20 C.F.R. 404.1529(c)(3)). An ALJ who finds that a claimant is not credible must do so "explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his determination is supported by substantial evidence." *Rivera v. Astrue*, No. 10-civ-4324, 2012 WL 3614323, at *14 (E.D.N.Y. Aug. 21, 2012) (quoting *Taub v. Astrue,* No. 10-civ-2526, 2011 WL 6951228, at *8 (E.D.N.Y. Dec. 30, 2011).

Here, the ALJ found that "claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible to the extent they are inconsistent with the above residual functional capacity assessment." Tr. at 23. The ALJ committed legal error in his assessment of plaintiff's credibility because "[i]n a formulation that suggested a clear violation of [the] rule [requiring an ALJ to assess the credibility of a claimant's statements and only then go on to determine his RFC], the ALJ announced his RFC assessment and then wrote that [the Plaintiff's] statements were not credible to the extent they were inconsistent with that RFC assessment." *Box v. Colvin*, No. 12-civ-1317, 2014 WL 997553, at *21 (E.D.N.Y. Mar. 14, 2014) (citing *Maldonado v. Commissioner of Social Sec.,* No. 12–civ–5297, 2014 WL 537564, at *17 (E.D.N.Y. Feb. 14, 2014) (citing *Otero v. Colvin,* No. 12–civ–4757, 2013 WL 1148769, at *7 (E.D.N.Y. Mar. 19, 2013))). Courts in this district have repeatedly found remand to be appropriate based on an ALJ's use of this shorthand credibility determination because "assessing a plaintiff's credibility after making an RFC determination warrants remand, as the SSA "regulations provide that the ALJ must assess the claimant's credibility *before* evaluating the RFC." *Adesina v. Astrue*, No.

30

12-civ-3184, 2014 WL 5380938, at *12 (E.D.N.Y. Oct. 22, 2014) (citing *Genier*, 606 F.3d at 49); *see also Yu v. Astrue*, 963 F. Supp. 2d 201, 217 (E.D.N.Y. 2013) (remanding where ALJ employed the same "to the extent...inconsistent" formulation used here); *Otero*, 2013 WL 1148769, at *7 (same); *Smollins v. Astrue*, 2011 WL 3857123, at *10 (E.D.N.Y. Sept.1, 2011) (same). "The failure to apply the proper legal standard in weighing Plaintiff's credibility is, alone, a basis for remand." *Adesina*, 2014 WL 5380938, at *12.

The ALJ also failed to properly consider all the factors listed in 20 C.F.R. § 404.1529(c)(3) and explain how he balanced those factors. *See id*. at *13 ("When conducting a credibility inquiry, the ALJ is required to consider all of the factors listed in 20 C.F.R. § 404.1529(c)(3) and explain how she balanced those factors."). In his decision, the ALJ stated that claimant testified that he takes pain medication three (3) times per week, his main complaint to his physician was left shoulder stiffness and tolerable right biceps pain, and that claimant can use a computer and put groceries away in upper shelves and stated to the consultative examiner that sitting was not a problem. Tr. at 23. The ALJ concluded that "in applying the SSR 96-7 factors, claimant's allegations of disabling pain and dysfunction are not supported by the record." *Id*. at 24. The ALJ failed to take into account the duration, frequency and intensity of plaintiff's pain, any precipitating and aggravating factors, the type, dosage, effectiveness and side effects of plaintiff's medication, non-medicinal treatment plaintiff received, and other measures plaintiff employs to relieve the pain. The record included plaintiff's testimony that he was "uncomfortable most of the time…[and] can't do anything physical" (*id*. at 34), that he could only sit for a half hour before he had pain (*id*. at 38), that he gets pain in his back and his arm when he sits for that long (*id*.), that he can stand for only five (5) to ten (10) minutes (*id*.),

that he could walk for only five (5)-ten (10) minutes, and that his pain was "constant" (*id*. at 44), especially "if [he is] moving around a lot" (*id*.) and that he lays down and takes naps at least twice a day. *Id*. In conducting his credibility analysis, the ALJ focused only on claimant's daily activities, specifically his ability to use a computer and put groceries away in the upper shelves, and his statement to the consultative examiner that sitting was not a problem (*id*. at 23), however, an ALJ must "consider each of the factors set forth in § 404.1529(c)(3)" and may not "simply selectively choose evidence in the record that supports his conclusion" or "mis-characterize a claimant's testimony or afford inordinate weight to a single factor, because "[a] claimant need not be an invalid to be found disabled under the Social Security Act.... If on remand the ALJ again reaches step four of his analysis, he should give proper weight to [Appellant's] testimony, including consideration of all of the factors identified above as required by SSR 96–7P, and should not base a finding on [his] ability to undertake essential daily tasks…" *Meadors*, 370 F. App'x at 185, n.2 (internal quotations and citations omitted).

Additionally, the ALJ provided no discussion of plaintiff's twenty-year work history in the context of his credibility analysis.[1] "A claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability." *Rivera v. Schweiker*, 717 F.2d 719, 725 (2d Cir. 1983); *see also Singletary v. Sec'y of Health, Educ. &*

_____

[1]    The Commissioner argues that the ALJ considered plaintiff's long work history by mentioning it in his determination that the claimant was unable to perform any past relevant work. [Docket Entry No. 19, at 3 (citing Tr. at 24)]. However, "[t]he rule in *Rivera* requires the ALJ to apply a good work record toward the claimant's credibility, not merely mention the work history somewhere in his or her decision." *Milien v. Astrue*, No. 10-civ-2447, 2010 WL 5232978, at *10 (E.D.N.Y. Dec. 16, 2010); *see also Wilber v. Astrue,* 2008 WL 850327, at *3 & n. 3, No. 07–civ–57S (W.D.N.Y. Mar. 28, 2008) (where ALJ mentioned work history as fact but gave it no weight in credibility determination, ALJ did not follow *Rivera* rule).

*Welfare,* 623 F.2d 217, 219 (2d Cir. 1980) ("[A] life history of hard labor performed under demanding conditions over long hours...justifies the inference that when [claimant] stopped working he did so for the reasons testified to."). The ALJ therefore erred in failing to consider plaintiff's work history in evaluating plaintiff's credibility. *See Tarsia v. Astrue,* 418 F. App'x 16, 19 (2d Cir. 2011) (noting that despite the "special deference" courts give to an ALJ's credibility assessment, the ALJ committed error when he failed to take into account the claimant's "extensive work history"); *Horan v. Astrue*, 350 F. App'x 483, 485 (2d Cir. 2009) ("ALJ committed legal error in failing to consider [plaintiff's] work history"); *Fernandez v. Astrue*, No. 11-civ-3896, 2013 WL 1291284, at *20 (E.D.N.Y. Mar. 28, 2013) ("ALJ failed to evaluate Plaintiff's long work history in making a credibility assessment.").

On remand, the ALJ should assess claimant's credibility, in light of his work history, the factors in § 404.1529(c)(3) and all the information in his file, including evidence submitted after the original ALJ Decision, before determining plaintiff's residual functional capacity. To the extent the ALJ on remand determines that any of claimant's statements are inconsistent with medical evidence in the record, the ALJ should specify the statements and the evidence in the record, and explain why he chooses to discredit the statements with reference to the applicable regulatory factors. *See* 20 C.F.R. § 404.1529(c)(3)(i)-(vii).

2.      ALJ's Decision at Step Five

Plaintiff also challenges the ALJ's application of the medical vocational rule § 202.14 at step (5). Because I conclude that the ALJ erred in assessing plaintiff's credibility, I am unable to subject the ALJ's RFC determination to meaningful review and therefore do not reach plaintiff's remaining contentions regarding whether the ALJ properly applied the medical vocational rule

§202.14 at step five (5). *See Meadors*, 370 F. App'x at 185-86 ("Because we conclude that the ALJ erred in assessing Appellant's credibility, thereby depriving us of the ability to subject his RFC determination to meaningful review, we do not reach the question of whether the ALJ was required to consult a vocational expert at Step 5 of the sequential analysis."); *Spear v. Astrue*, No. 13-civ-6017, 2014 WL 4924015, at *20 (W.D.N.Y. Sept. 30, 2014) ("Because I conclude that the ALJ's credibility assessment was the result of legal error, I am unable to subject the ALJ's physical RFC analysis to meaningful review, and I do not reach [plaintiff's] remaining contentions regarding the ALJ's physical RFC assessment or the vocational expert's testimony at step five.").

III.    CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure is denied and plaintiff's cross-motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure is granted in part and this case is remanded for further proceedings consistent with this opinion.

**SO ORDERED**.


                                        s/ Sandra J. Feuerstein_____
                                        Sandra J. Feuerstein
                                        United States District Judge

Dated: March 30, 2015
        Central Islip, New York